IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DARIO CORREA, | ) | CASE NO. 4:17CV180 |
| | ) | |
| Petitioner, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| RONALD ERDOS, | ) | |
| | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

Petitioner Dario Correa ("Petitioner" or "Correa") brings this habeas corpus action pursuant to 28 U.S.C. § 2254. Doc. 4. Correa is detained at the Southern Ohio Correctional Facility, having been found guilty by a Mahoning County, Ohio, Court of Common Pleas jury of one count each of aggravated murder, aggravated robbery, tampering with evidence, and arson, and two firearm specifications. *State v. Correa*, Case No. 11 CR 804(A) (Mahoning Cty. Common Pleas Ct., filed February 15, 2013). At sentencing, the trial court merged Correa's two firearm specifications and sentenced him to 25 years to life for aggravated murder, 11 years for aggravated robbery, three years for tampering with evidence, one year for arson, and three years for the firearm specification, all to be served consecutively, for a total of 43 years to life in prison. Doc. 10-1, p. 22.

On January 23, 2017, Correa filed his Petition for Writ of Habeas Corpus setting forth five grounds for relief. Doc. 1, pp. 7-19. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2. As set forth more fully below, Grounds 1 and 5 are not cognizable and/or fail on the merits, Ground 2 is not cognizable, and Grounds 3 and 4 fail on the merits. Thus, the undersigned recommends that Correa's Petition for Writ of Habeas Corpus (Doc. 4) be **DENIED**.

## I. Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008).

### A.  State Court Action

#### 1.  Underlying Facts

The following summary of underlying facts is taken from the opinion of the Mahoning County Court of Appeals, Seventh Appellate District of Ohio:[1]

{¶ 2} On January 1, 2011, Randy Cappelli was shot to death on Shady Run Road in Youngstown. His body was found next to his car which had been set on fire. On January 5, 2012, Correa was indicted by the Mahoning County Grand Jury charged with aggravated murder, R.C. 2903.01(B), an unclassified felony, with an accompanying firearm specification under R.C. 2941.145(A); aggravated robbery, R.C. 2911.01(A)(1), a first-degree felony, with an accompanying firearm specification under R.C. 2941.145(A); tampering with evidence, R.C. 2921.12(A)(1), a third-degree felony; and arson, R.C. 2909.03(A)(1) and (B)(2)(b), a fourth-degree felony.

{¶ 3} Co-defendant Emmanuel Dawson was charged in the same indictment with the same offenses. Dawson subsequently entered into an agreement with the State; in exchange for testifying against Correa, the State agreed to dismiss the indictment against Dawson.

\*      \*      \*

{¶ 5} On January 1, 2011, Doris Sobnosky and her friend Jodi Menough celebrated New Year's Eve at Sobnosky's house. Sobnosky explained that the portion of Shady Run where she lives is a dead-end street, where only she and a 90–year–old woman live. She and Menough drank a few beers that evening, but stopped around midnight due to the celebratory shooting going on around her house; they resumed drinking sometime after 3:00 a.m. when the shooting subsided.

{¶ 6} Just after 4:00 a.m., Sobnosky opened her front door after she heard a car door, something she found unusual at that time of night. As she opened the door, she saw a car

---

[1]  Correa has not demonstrated by clear and convincing evidence that the state court's findings were incorrect. Accordingly, the state court's findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1); *see also Railey*, 540 F. 3d at 397.

driving down Shady Run, which appeared to be a gray or dark blue Toyota. She said it was "pouring" outside at the time, but visibility was good, because she and her neighbor had lights on, and there was still snow on the ground, which provided ambient light. After hearing six gunshots, she shut the door immediately and began to look out of the peephole instead.

{¶ 7} The gunshots sounded like they came from the vehicle that passed by her house; however, she could not tell whether they came from inside or outside of the car. On cross-examination, she stated that she heard the gun shots simultaneously with the car driving down the street. She said as far as she knew, the car did not stop before the shots were fired.

{¶ 8} Sobnosky watched the vehicle make a U-turn with its door open, but she could not see how many people were inside. The door was then pulled shut as the vehicle fled the scene towards Powersdale Avenue, the cross-street.

{¶ 9} Sobnosky turned out her lights and went into her bedroom, watching out of that window, which also faces the road, but is recessed. Seven minutes later, she saw the same vehicle return from Powersdale and stop in front of the vacant house next door. She was certain that seven minutes had elapsed because she had her cell phone in her hand and was watching the clock. The car first pulled to the right curb, backed up, and then pulled to the left curb.

{¶ 10} Sobnosky then saw two men exit the vehicle and approach the hatchback. One appeared to be wearing a baseball cap. She said the two opened the hatchback and it appeared as if they were looking for something. One man approached the front of the car and opened the hood. At that point, she called 911 because she feared they were lighting the car on fire when she saw them under the hood. Sobnosky went back downstairs to get a better view from the window there. She then observed a body near the right-hand curb where the vehicle had originally stopped.

{¶ 11} She said the two men then began walking up Shady Run, talking and laughing amongst themselves. She described the men as "on the younger side, not old men, thin, one light, one dark." Sobnosky admitted, however, that her eyesight was "not very good," and that she was not wearing her glasses that night. For that reason, she gave the phone to Menough to give police a better description. Sobnosky said she lost sight of the men as they walked away. Soon thereafter, police arrived.

{¶ 12} Menough's testimony mainly mirrored Sobnosky's. However, Menough recalled that the two had much more alcohol to drink; believing they mostly consumed two 12–packs of beer. She described the suspects as a black male wearing a red hat, and a Hispanic male with a white T-shirt. The Hispanic male appeared taller and thinner than the black male. She admitted she is nearsighted and although she wore glasses while on the stand, she was not wearing them the night of the shooting. In addition, Detective–Sergeant Daryl Martin subsequently testified that Menough originally described the second man as Caucasian and not Hispanic.

{¶ 13} Raymond Gallaugher, Sr. testified that a few days prior to January 1, 2011, he went to see men he knew as "Emoe" and "Detroit" to purchase drugs at a house on Hunter Street. He did not recall the address, but said it was located about two or three blocks from Shady Run. While there, he met the victim, Cappelli; he had never seen Cappelli there before. He recalled sharing a crack pipe with Cappelli and talking with him. Gallaugher also recalled that Cappelli offered to go to his wife's house and get the washing machine to give it to Dawson and Terrence Emmanuel, presumably for more crack. Gallaugher contacted police after he heard that Cappelli had been killed and that his car was found on Shady Run Road. He admitted to having a past felony criminal record, but said he did not receive anything in exchange for his testimony; the last time he was arrested was in 2008.

{¶ 14} Madeline DeJesus testified that that she was Cappelli's girlfriend, that he drove a 2003 "Toyota Scion" and that he abused crack cocaine. DeJesus learned from Det. Martin on January 1, 2011, that Cappelli had been murdered. DeJesus last saw Cappelli alive on the morning of December 31, 2010, between 8:30 a.m. and 9:30 a.m. after he had removed the washing machine from her house to exchange for more crack. She was upset and Cappelli said he would get it back for her. She identif[i]ed her washing machine after it was taken by police as evidence out of the house on Hunter.

{¶ 15} Emmanuel Dawson who was from Detroit, Michigan and also known by the name "Emoe," testified next. He admitted that in exchange for his testimony against Correa, the State had agreed to dismiss all charges against him. He also admitted that he had been previously convicted of armed robbery, felony firearms charges, drug charges, credit card fraud, and domestic violence, and had been incarcerated for 12 years in Michigan. He conceded that it was not easy for him to testify because he did not want to be a "snitch," and testifying against Correa, a relation of his brother, would create a division within his family. After making a statement to police and while incarcerated, Dawson wrote two letters to Correa; assuring Correa in one that he would not testify against him and urging him not to worry because neither one of them had shot Cappelli. Dawson said when he wrote the letter he was having second thoughts about testifying.

{¶ 16} At the end of 2010, after being released from prison, Dawson was in Youngstown selling drugs out of his brother Terrence's house on Hunter Avenue where he met Correa. His sister-in-law Sylvia Cuebas is also Correa's aunt. Dawson first met Cappelli when he came to Terrence's house to buy drugs. Cappelli would drive him to Detroit multiple times to pick up additional drugs and in exchange Dawson supplied Cappelli with more drugs. The two talked a lot and he got to know Cappelli, who continued to drive Dawson in exchange for crack for about a month prior to his death.

{¶ 17} During the early morning hours of December 31, 2010, Cappelli offered to sell Terrence a washing machine in exchange for $20 cash and $60 worth of crack. Dawson stated that Correa was present but not involved in the transaction. Later that morning, Cappelli drove Dawson to the grocery store and they returned to Terrence's house where they all ate breakfast. After breakfast, Dawson, Cappelli, and Correa went to the liquor store, and later in the day they went to Golden Corral for dinner, but Cappelli stayed in

the car and smoked crack. Afterwards, they returned to Terrence's house and stayed there until shortly after midnight.

{¶ 18} Dawson testified that around 12:30 a.m., he, Correa and Cappelli went to Deja Vu, a club on Market Street in Youngstown. Again, Cappelli stayed in his vehicle, but Dawson and Correa stayed in the club until it closed, around 2:00 or 2:30 a.m. After leaving the club, Dawson stated that his memory was blurry because he had been drinking and taking pills all night. Dawson was in the front passenger seat while Cappelli drove, and remembered leaving the parking lot, but he fell asleep.

{¶ 19} Dawson later awoke to Correa and Cappelli arguing, they both exited the vehicle and Correa shot Cappelli. Dawson heard gunshots and then saw Cappelli's body fall. Correa returned to the vehicle holding a gun. Dawson denied carrying a gun that evening, but that Correa probably had a gun on his person the entire night. Correa drove the two back to Terrence's house which was right around the corner.

{¶ 20} Dawson told Terrence what happened. Correa and Dawson then decided to drive Cappelli's vehicle back to where Cappelli was shot, and it was set on fire, but Dawson did not remember who started it. The two then walked back to Terrence's house.

{¶ 21} On cross-examination, Dawson admitted that his main reason for testifying was to get himself out of trouble. He also said that Cappelli told him the day before New Year's Eve that he was having problems with his girlfriend and that she had kicked him out of her house.

{¶ 22} As part of his investigation, Youngstown Detective–Sergeant Daryl Martin interviewed both Dawson and Correa. He first spoke to Dawson by phone, while Dawson was incarcerated in a Michigan county jail. According to Dawson, Det. Martin confronted him with the evidence police had so far and Dawson feared he was being "set up" for a murder he had not committed. As a result, Dawson said he decided to make a truthful statement about what happened that night. About one week after speaking with Dawson by phone, Det. Martin drove to Michigan to interview Dawson. Dawson's statement to Det. Martin was consistent with his trial testimony.

{¶ 23} Approximately one year later, after Correa had been arrested pursuant to the indictment, Det. Martin also interviewed Correa. During the detective's testimony, A DVD of that interview was played for the jury. During the interview, Correa admitted he and Dawson were with Cappelli on the night in question, but said Cappelli dropped them both off at Terrence's house around 2:30 a.m. and that they did not leave again that night. Even after the detective explained to Correa that Dawson had implicated him in the shooting, Correa still maintained that neither of them shot Cappelli. Notably, on the video, when Det. Martin leaves the interview room, Correa can be seen on camera smiling, laughing and singing to himself.

{¶ 24} Det. Martin further testified that Cappelli's Toyota was found burning when officers arrived on the scene, and eight .380 shell casings recovered at the scene were fired from the same weapon, but no gun was ever recovered.

{¶ 25} On cross-examination, Det. Martin admitted that Cappelli[]'s sister had mentioned to him to look into his girlfriend DeJesus as a possible suspect, but that no further information was given. He admitted there were other adults at the Hunter Avenue house on the night of Cappelli's murder, but that he only interviewed Terrence and his wife Sylvia, along with Dawson and Correa. On redirect, he affirmed there was no evidence pointing towards any other suspects aside from Dawson and Correa.

{¶ 26} Dr. Joseph Ohr, M.D., the medical examiner and deputy coroner testified Cappelli died of multiple gunshot wounds to his head and neck, and the manner of death was homicide.

{¶ 27} At the close of the State's case, the defense made a Crim.R. 29 motion for acquittal, which was overruled by the trial court.

{¶ 28} Correa then testified in his own defense, admitting he had prior drug convictions. At the time period in question, he lived in New Jersey, but was in Youngstown to celebrate New Year's Eve, and had been drinking and taking pills that night. Correa's testimony was identical to Dawson's up to the point that the two left the club. Specifically, Correa testified that when the two left the club, at around 2:00 a.m., Dawson got into an argument with a girl outside, and a Youngstown police officer told him to get Dawson out of there before he was arrested. The three men stopped to get gas and drove back to Terrence's house, arriving around 2:30 a.m. Cappelli dropped them off and that was the last time he saw Cappelli. When he and Dawson arrived Terrence and Sylvia were still awake, talking and drinking, but everyone else in the house had gone to bed. Correa fell asleep shortly after returning to the house.

{¶ 29} Correa stated that his father woke him the next morning around 6:00 a.m., and he left because he had to return to New Jersey for work. He said he first learned that Cappelli had been murdered a year after the fact, when Sylvia texted him that he was wanted by police in connection with the crime. Correa denied murdering Cappelli and further stated that Dawson did not murder Cappelli either. He said he only knew Cappelli for a few hours and there was no reason for him to have a problem with Cappelli, who had done "nothing but help my family."

{¶ 30} On cross examination, the prosecutor questioned Correa about why Dawson would lie and concoct a story to implicate him in the murder, as Correa contended, when there were witnesses to corroborate his contention that he and Dawson were asleep at the Hunter Avenue house at the time of the murder. Correa responded that Dawson was scared and did not want to return to prison.

{¶ 31} Correa presented two alibi witnesses: his aunt, Sylvia Cuebas, who raised him until he was about 18 months old, and Terrence Emmanuel, Correa's uncle by marriage to Sylvia. Sylvia testified that on January 1, 2011, Cappelli dropped off Dawson and Correa at her house around 2:30 a.m. and that Dawson and Correa were intoxicated and fell asleep on her couch about ten minutes after arriving.

{¶ 32} Later that morning, Sylvia said she heard a lot of sirens; she and Terrence walked down the street to see what was going on, but an officer stopped them and told them to go home. At that time, she did not know what had happened to cause the police presence; she learned about the shooting after the fact, while watching the news. Contrary to Correa's testimony, Sylvia said Correa left her house around noon on January 1, 2011, not 6:00 a.m.

{¶ 33} Terrence testified that Cappelli had been at his house for several days prior to his murder because he was having problems with DeJesus. Dawson and Correa returned from the club around 2:30 a.m. on January 1, 2011, and that Cappelli borrowed his phone to call someone from the driveway and then left. Although Terrence testified that Dawson and Correa fell asleep together on his couch and took pictures of them, he later conceded he never gave any photographs to police to verify the two were at his home during the time of Cappelli's murder.

{¶ 34} Similar to Sylvia's testimony, Terrence said they heard a lot of sirens and they walked down the street to see what was going on, but an officer stopped them and told them to go home. However, Terrence's testimony was inconsistent with Sylvia's insofar as he said police told them there was "a body" at the scene.

{¶ 35} Terrence admitted that he was previously convicted of forgery and carrying a concealed weapon, and that he called Dawson, who was jailed in Michigan, and sent newspaper clippings about the case.

*State v. Correa*, 2015 WL 5691899, at ** 1-6 (Ohio Ct. App. Sept. 25, 2015).

## 2.  Procedural History

On January 5, 2012, a Mahoning County Grand Jury issued an indictment charging Correa with aggravated murder, R.C. 2903.01(B)(D)) (Count 1), with a firearm specification; aggravated robbery, R.C. 2911.01(A)(1)(B)) (Count 2), with a firearm specification; tampering with evidence, R.C. 2921.12(A)(1)(B))(Count 3); and arson, R.C. 2909.03(A)(1)(B)(2)(b)) (Count 4).  Doc. 10-1, pp. 3-5.  Correa, through counsel, pleaded not guilty.  Doc. 10-1, p. 6.

The jury found Correa guilty on all counts, including the firearm specifications.  Doc. 10-1, pp. 7-12.  Correa moved for acquittal, arguing that there was insufficient evidence to support the verdict.  Doc. 10-1, p. 13, 15.  The trial court denied his motion.  Doc. 10-1, p. 20.  At sentencing, the trial court merged Correa's two firearm specifications and sentenced him to 25 years to life for aggravated murder, 11 years for aggravated robbery, three years for tampering

with evidence, one year for arson, and three years for the firearm specification, all to be served

consecutively, for a total of 43 years to life in prison.  Doc. 10-1, p. 22.

**B. Direct Appeal**

Correa, through new counsel, timely appealed his conviction and sentence to the Ohio

Court of Appeals, Seventh Appellate District.  Doc. 10-1, p. 24.  In his brief, he raised the

following assignments of error:

> 1. The trial court abused its discretion by failing to grant Appellant's motion for a mistrial due to repeat statements regarding co-defendant Emmanuel Dawson's request to take a polygraph examination.
>
> 2. The trial court denied Appellant due process under the Fourteenth Amendment due to the fact his convictions for aggravated murder, aggravated robbery with firearm specifications, tampering with evidence and arson were against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented at trial.
>
> 3. The trial court erred to the prejudice of Appellant by denying Appellant's Criminal Rule 29 motion for directed verdict of acquittal when there was insufficient evidence to prove the elements of the crimes charged against appellant by proof beyond a reasonable doubt.
>
> 4. The trial court erred to the prejudice of the Appellant by giving an instruction to the jury for complicity as an aider and abettor when the evidence and testimony adduced at trial was contrary to the instructions and in contradiction to the Appelle[e]'s theory of the case.
>
> 5. The trial court erred to the prejudice of Appellant by sentencing him to the maximum consecutive sentences for his convictions for aggravated murder and aggravated robbery with firearm specifications and for tampering with evidence and arson without properly considering Ohio sentencing statutes pursuant to R.C. 2953.08(G)(C)(4).

Doc. 10-1, pp. 26-27.  On September 25, 2015, the Ohio Court of Appeals affirmed the trial

court's judgment.  Doc. 10-1, pp. 106-126.

Correa, through counsel, filed an appeal to the Ohio Supreme Court.  Doc. 10-1, p. 130.

In his memorandum in support of jurisdiction, he raised the following propositions of law:

I. The trial court and the Seventh District Court of Appeals abused its discretion by failing to grant Appellant's motion for a mistrial due to repeat statements regarding co-defendant Emmanuel Dawson's request to take a polygraph examination.

II. The trial court and the Seventh District Court of Appeals denied Appellant due process under the Fourteenth Amendment due to the fact his convictions for aggravated murder, aggravated robbery with firearm specifications, tampering with evidence and arson were against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented at trial.

III. The trial court and the Seventh District Court of Appeals erred to the prejudice of Appellant by denying Appellant's Criminal Rule 29 motion for directed verdict of acquittal when there was insufficient evidence to prove the elements of the crimes charged against appellant by proof beyond a reasonable doubt.

IV. The trial court and the Seventh District Court of Appeals erred to the prejudice of the Appellant by giving an instruction to the jury for complicity as an aider and abettor when the evidence and testimony adduced at trial was contrary to the instructions and in contradiction to the Appellee's theory of the case.

V. The trial court and the Seventh District Court of Appeals erred to the prejudice of Appellant by sentencing him to the maximum consecutive sentences for his convictions for aggravated murder and aggravated robbery with firearm specifications and for tampering with evidence and arson without properly considering Ohio sentencing statutes pursuant to R.C. 2953.08(G)(C)(4).

Doc. 10-1, pp. 133-134. On February 24, 2016, the Ohio Supreme Court declined to accept

jurisdiction pursuant to S.Ct.Prac.R. 7.08(B)(4). Doc. 10-1, p. 177.

### C. Federal Habeas Petition

On January 23, 2017, Correa, pro se, filed his Petition for a Writ of Habeas Corpus. Doc.

1. He listed the following grounds for relief:

**Ground One**: The trial court abused its discretion by failing to grant petitioner's motion for a mistrial due to repeated statements regarding codefendant Emmanuel Dawson's request to take a polygraph examination.

**Ground Two**: The trial court denied petitioner's due process under the Fourteenth Amendment due to the fact his convictions for aggravated murder, aggravated robbery with firearm specifications, tampering with evidence and arson were against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented at trial.

**Ground Three**: The trial court erred to the prejudice of petitioner by denying petitioner's Criminal Rule 29 motion for directed verdict of acquittal when there was insufficient evidence to prove the elements of the crimes charged against appellant by proof beyond a reasonable doubt.

**Ground Four**: The trial court erred to the prejudice of petitioner by giving an instruction to the jury for complicity as an aider and abettor when the evidence and testimony adduced at trial was contrary to the instruction and in contradiction to the state's theory of the case.

**Ground Five:** The trial court erred to the prejudice of petitioner by sentencing him to the maximum consecutive sentences for his convictions for aggravated murder and aggravated robbery with firearm specifications and for tampering with evidence and arson without properly considering Ohio sentencing statutes pursuant to R.C. 2953.08(G)(2)(B).

Doc. 4, pp. 7-19.  On June 6, 2017, Respondent filed a Return of Writ (Doc. 10).  Correa did not file a Traverse.

## II. Standard of Review under AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner must meet certain procedural requirements in order to have his claims reviewed in federal court.  *Smith v. Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 430 (6th Cir. 2006).  In order to obtain habeas relief under 28 U.S.C. § 2254(d), a petitioner must show either that the state court decision (1) resulted in a decision contrary to, or involving an unreasonable application of, clearly established federal law as determined by the United States Supreme Court ("contrary to" clause); or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings ("unreasonable application" clause).  *Id.*

"Under the 'contrary to' clause, a federal habeas court may grant a writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or [based on] a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  Under the "unreasonable application" clause, a federal habeas court

may grant the writ if the state court identifies the correct governing legal principle from th[e]

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

at 413.  "Clearly established federal law" refers to the holdings, not dicta, of the Supreme

Court's decisions as of the time of the relevant state court decision, as well as legal principals

and standards flowing from Supreme Court precedent.  *Id.* at 412; *Ruimveld v. Birkett*, 404 F.3d

1006, 1010 (6th Cir. 2005).  A state court is not required to cite Supreme Court precedent or

reflect an awareness of Supreme Court cases, "so long as neither the reasoning nor the result of

the state-court decision contradicts" such precedent.  *Early v. Packer*, 537 U.S. 3, 8 (2002);

*Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005).  If the Supreme Court has not addressed the

petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary

to, or unreasonably applied, Supreme Court precedent or clearly established federal law.  *Carey*

*v. Musladin*, 549 U.S. 70, 77 (2006).

In determining whether the state court's decision involved an unreasonable application of

law, the court employs an objective standard.  *Williams*, 529 U.S. at 409.  "A state court's

determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded

jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*,

562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also*

*Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011).  "A state prisoner must show that the state

court's ruling on the claim being presented in federal court was so lacking in justification that

there was an error well understood and comprehended in existing law beyond any possibility for

fair-minded disagreement."  *Harrington*, 562 U.S. at 103.

### III. Claim Analysis

Correa sets forth five grounds for relief in his Petition.  Doc. 4, pp. 7-19.  The undersigned recommends the Court find that all Correa's grounds are not cognizable and/or fail on the merits.

### A. Ground 1 is not cognizable and/or fails on the merits

In Ground 1, Correa argues that the trial court abused its discretion when it failed to grant his motion for a mistrial based on statements the jury heard at trial regarding Dawson's response to the detective's offer to take a polygraph test.  Doc. 1, p. 7.  Correa does not identify a federal constitutional violation; accordingly, his claim is not cognizable on federal habeas review.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States").

An abuse of discretion on the part of a state trial court in denying a motion for a mistrial may implicate a defendant's due process rights to a fair trial.  *Renico v. Lett*, 559 U.S. 766 (2010).  "[T]rial judges may declare a mistrial 'whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity' for doing so."  *Id*., at 773-774 (quoting *United States v. Perez*, 9 Wheat. 579, 579–580 (1824)).  "Manifest necessity" means a "'high degree' of necessity."  *Id*., at 774 (quoting *Arizona v. Washington*, 434 U.S. 497, 506 (1978)).  The trial court's exercise of discretion must be "sound"; if not, the appellate court does not give it deference.  *Id*., at 775 (quoting *Washington*, 434 U.S. at 510).  For instance, "if the trial judge acts for reasons completely unrelated to the trial problem which purports to be the basis for the mistrial ruling, close appellate scrutiny is appropriate," and "if a trial judge acts irrationally or irresponsibly, ... his action cannot be condoned."  *Id*. (quoting *Washington*, 434 U.S. at 510, 514).  Because abuse of discretion is a broad standard and a general rule, "it follows that...the more leeway [state] courts have in reaching outcomes in case-by-case determinations."  *Id*., at 776 (quoting *Yarborough*, 541 U.S. at 664).

The Ohio Court of Appeals considered and rejected Correa's claim as follows:

{¶ 40} The decision to declare a mistrial rests within the sound discretion of the trial court. *State v. Hood*, 132 Ohio App.3d 334, 337, 724 N.E.2d 1238 (7th Dist.1999), citing *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343, 349–350 (1987). "Abuse of discretion means an error in judgment involving a decision that is unreasonable based upon the record; that the appellate court merely may have reached a different result is not enough." *State v. Dixon*, 7th Dist. No. 10 MA 185, 2013–Ohio–2951, ¶ 21. This deferential standard controls our review because "[t]he trial judge occupies the best position to determine whether a mistrial is warranted." *Hood*, 132 Ohio App .3d at 337.

{¶ 41} A decision to declare a mistrial is proper when: "(1) there was a manifest or high degree of necessity for declaring a mistrial or (2) without a mistrial, public justice would have been diminished." *Id.* "Granting a mistrial is an extreme remedy only warranted in circumstances where a fair trial is no longer possible and it is required to meet the ends of justice." *State v. Brooks*, 7th Dist. No. 07–MA–79, 2008–Ohio–6600, ¶ 12, citing *State v. Jones*, 83 Ohio App.3d 723, 737, 615 N.E.2d 713 (1992). Moreover, it is not proper to grant a mistrial "merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected." *State v. Lukens*, 66 Ohio App.3d 794, 809, 586 N.E.2d 1099 (1990).

{¶ 42} As an initial matter, Correa's argument regarding the inadmissibility of polygraph examination results are irrelevant because no results of any polygraph test were admitted during trial or even proffered. *State v. Russell*, 2d Dist. No. 21458, 2008–Ohio–774, ¶ 108. This leaves for our resolution Correa's contention that the mere mention that a witness or defendant has taken or declined a polygraph examination can be prejudicial error; specifically that a mistrial was warranted after the jury was exposed to two comments regarding Dawson's refusal to take a polygraph examination.

{¶ 43} The Tenth District in *State v. Rowe*, 68 Ohio App .3d 595, 589 N.E.2d 394 (10th Dist.1990) delineated factors to determine whether testimony presented regarding a polygraph examination is prejudicial: "(1) whether defendant objected and/or sought a cautionary instruction; (2) whether the reference was inadvertent; (3) whether there were repeated references; (4) whether the reference was an attempt to bolster a witness's credibility; (5) whether the results of the test were admitted rather than merely the fact that a test had been conducted." *Rowe* at 611. The *Rowe* test has been followed in more recent cases involving the improper admission of polygraph examination testimony during a criminal trial. *See, e.g., State v. Rojas*, 10th Dist. No. 11AP–683, 2012–Ohio–1967; *State v. Meares*, 5th Dist. No. 10–CA–2, 2011–Ohio–43.

{¶ 44} The first instance involved defense counsel's cross-examination of Dawson, where he indicated that he was contacted by Det. Martin who tried to talk him into taking a polygraph examination. The State immediately objected and the trial court instructed the jury to disregard Dawson's response to the question.

{¶ 45} The second instance occurred during the State's direct examination of Det. Martin while a DVD of Correa's interview was played for the jury; this contained the following

discussion between Det. Martin and Correa regarding Dawson's refusal to take a polygraph examination which the State failed to redact:

> Det. Martin: The reason I wanna talk to you is cause I don't know for sure who, I, I firmly believe you were there, okay. I'm not saying you shot anybody, okay. I'm just telling you what I think, okay. I know for a fact that you were there. But that's okay, I'm not going to argue with you about it. I can understand your position and why you would not want to put yourself there, okay. But I'm just saying if this kid's lying and he's putting the shooting on you, which is exactly what he's doing, then I'm just affording the opportunity cause whoever comes up with the best story about who was the shooter and wasn't the shooter, they get the best deal. That's what it boils down to and that's why I'm here to you, to offer it to you. Okay. * * * *The only reason why he was getting charged with just tampering with evidence cause he was going to testify against you but under the agreement was he had to take a polygraph test, okay, and I went back all the way up to Michigan, it ain't a pleasant drive. I don't like Michigan. I went back up there to give him the polygraph test and at the last second he backed out, which make me wonder one of two things, either he's just afraid to do it or he's the shooter and he's afraid we're gonna find out, and that's*

> Correa: I don't know what's his reasoning for anything.

> Det. Martin: Well, you're not close to the guy, right.

> Correa: I don't even know him like that, this, that was the first time I ever met him. (Emphasis added)

{¶ 46} Defense counsel sought to cross-examine Det. Martin about the polygraph since he stated on the DVD that he found Dawson's refusal to take it indicative that Dawson was lying, a position detrimental to the State's case. The State opposed this request, apologized for inadvertently failing to redact the conversation about the polygraph and suggested that the trial court give another curative instruction. The trial court denied that line of cross-examination, concluding that doing so would essentially allow Det. Martin to opine about Dawson's credibility, which is not permitted under the Rules of Evidence.

{¶ 47} Correa moved for a mistrial, which the trial court overruled, giving the following curative instruction instead:

> Ladies and gentlemen, the court had previously instructed you to disregard testimony concerning a polygraph test or examination. That instruction came during the testimony of Emmanuel Dawson. There was testimony during the video statement of the defendant Dario Correa and Detective Sergeant Martin concerning a polygraph examination. I am, once again, instructing you to disregard testimony concerning a polygraph examination and to treat any such testimony as if it never happened. I give this curative instruction because polygraph examinations are not normally admissible in Ohio courts. It's only if there is a stipulation or agreement between the parties that a polygraph

examination can be admitted. There's been no stipulation or agreement, so, again, you are instructed to disregard any reference or testimony concerning polygraph examinations.

{¶ 48} Applying the *Rowe* factors here, first, objections were lodged to both references to the polygraph test; by the State to the first and by Correa to the second. Following both comments, the trial court instructed the jury to disregard the statements. Second, both comments appear to be inadvertent. Third, while there were two references, they were brief and did not concern actual results of a polygraph test. Fourth, neither comment was an attempt to bolster Dawson's credibility; in fact, the reference on the DVD hurts Dawson's credibility and, prejudiced the State not the defense. Fifth, there were no results to present, because Dawson refused to take a polygraph test.

{¶ 49} Accordingly, the trial court's curative instructions were sufficient and it did not abuse its discretion by denying Correa's motion for a mistrial. Accordingly, Correa's first assignment of error is meritless.

*State v. Correa*, 2015 WL 5691899, at **7-9 (Oh. Ct. App. Sept. 25, 2015).

The standard that the Ohio Court of Appeals applied is the same standard a court applies when considering a due process violation based on whether a trial court abused its discretion when ruling on a motion for a mistrial. *Id.*, at *7 ("there was a manifest or high degree of necessity for declaring a mistrial ... or without a mistrial, public justice would have been diminished," quoting *Hood*, 724 N.E.2d at 1240, in turn citing *Washington*, 434 U.S. 497). The Ohio Court of Appeals observed that there were two, brief statements that were inadvertent at trial, one by defense and one by the state; commented that neither statement concerned actual polygraph results; found that the trial court instructed the jury to disregard the statements; and concluded that the statements actually hurt Dawson's credibility and harmed the state, not Correa's defense. *Id.*, at *9. In other words, the trial court's decision to deny Correa's motion for a mistrial was not "unsound," the trial court did not act for reasons completely unrelated to the trial problem purporting to be the basis for its ruling, and it did not act irrationally or irresponsibly. *Renico*, 559 U.S. at 775. It was therefore entitled to deference and the Ohio Court of Appeals' decision was not unreasonable. Ground 1 fails on the merits.

**B. Ground 2 is not cognizable**

In Ground 2, Correa argues that his due process rights were violated because the jury's verdict was against the manifest weight of the evidence and inconsistent with the evidence.  Doc. 4, pp. 9-10.  Ground 2 fails because federal habeas corpus relief is available only to correct federal constitutional violations, 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 US 1, 5 (2010), and a claim that a conviction is against the manifest weight of the evidence rests solely on state law and is not a cognizable claim in a federal habeas petition.  *See Ross v. Pineda*, 2011 WL 1337102, at *3 (S.D.Ohio April 11, 2011) ("Whether a conviction is against the manifest weight of the evidence is purely a question of Ohio law," citing *State v. Thompkins*, 678 N.E.2d 541 (Ohio 1997)).

**C. Ground 3 fails on the merits**

In Ground 3, Correa argues that there was insufficient evidence to prove the elements of the crimes charged.  Doc. 4, p. 14.  In reviewing a claim that a petitioner's conviction was not supported by sufficient evidence, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Under this standard, deference is due the trier of fact's determination.  *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  The standard is not whether the trier of fact made the correct guilt or innocence determination but, rather, whether it made a rational decision to convict or acquit.  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  Thus, in making a determination as to sufficiency of evidence, a court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury."  *Brown*, 567 F.3d at 205; *see also Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003).  "Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for

the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (internal quotations and citations omitted); *see also Durr v. Mitchell*, 487 F.3d 423, 449 (6th Cir. 2007) ("circumstantial evidence is entitled to equal weight as direct evidence"). On federal habeas review, an additional layer of deference applies. *Brown*, 567 F.3d at 205; *Coleman v. Johnson*, 566 U.S. 650 (2012). Accordingly, even if this Court were to conclude that a rational trier of fact could not have found petitioner guilty beyond a reasonable doubt, the Court "must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205 (emphasis in original); *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009).

The Ohio Court of Appeals considered Correa's sufficiency claim and his claim that his convictions were against the manifest weight of the evidence together as follows:

> {¶ 52} A challenge to the sufficiency of the evidence tests whether the state has properly discharged its burden to produce competent, probative, evidence on each element of the offense charged." *State v. Petefish*, 7th Dist. No. 10 MA 78, 2011–Ohio–6367, ¶ 16. Thus, sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id*. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997).

> {¶ 53} Conversely, "[w]eight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A conviction will only be reversed as against the manifest weight of the evidence in exceptional circumstances. *Id*. This is so because the triers of fact are in a better position to determine credibility issues, since they personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

> {¶ 54} Thus, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. However, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose

which one we believe." *State v. Dyke*, 7th Dist. No. 99 CA 149, 2002–Ohio–1152, *2, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). Under these circumstances, the verdict is not against the manifest weight and should be affirmed.

{¶ 55} Correa was convicted of four counts. Aggravated murder is defined as: "purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * arson, aggravated robbery, * * *[.]" R.C. 2903.01(B). Aggravated robbery is defined as attempting or committing a R.C. 2913.01 theft offense or fleeing immediately thereafter, and having a deadly weapon on the offender's person/control and displaying/brandishing/indicating/using it. R.C. 2911.01(A)(1).

{¶ 56} Tampering with evidence is defined as altering, destroying, concealing or removing evidence, with knowledge that a proceeding/investigation is in progress, in order to impair its value/provability as evidence. R.C. 2921.12(A)(1). Finally, arson is defined as knowingly, by means of fire or explosion, causing, or creating a substantial risk of, physical harm to any property of another without the other person's consent. R.C. 2909.03(A)(1).

{¶ 57} Dawson testified that during the early morning hours of January 1, 2011, he left a club with Cappelli and Correa and that he fell asleep in the car. Sometime thereafter, Dawson awoke to Correa and Cappelli arguing, then they both exited the vehicle and Correa shot Cappelli. Dawson heard gunshots and then saw Cappelli's body fall and Correa return to the vehicle holding a gun.

{¶ 58} The coroner testified that multiple gunshot wounds to the head and neck caused Cappelli's death, and ruled the death a homicide.

{¶ 59} Dawson further testified that Correa drove the two back to Terrence's house, and then they decided to return the car to the scene of the shooting a short time later. There, Cappelli's vehicle was set on fire, though Dawson said he did not remember who started it.

{¶ 60} When reviewing for sufficiency, the evidence is viewed in the light most favorable to the prosecution. *Smith*, 80 Ohio St.3d 89. Thus, this testimony supports the convictions, and survives a sufficiency review.

{¶ 61} With regard to manifest weight, this case turned on the jury's credibility determinations. The jury could have chosen to believe Dawson's testimony, which was generally supported by that of Menough and Sobnosky, or they could have chosen to believe Correa and his alibi witnesses, his aunt and uncle, Sylvia and Terrence.

{¶ 62} There were credibility problems on both sides. Dawson had a lengthy criminal record, was promised full immunity from prosecution in exchange for his testimony and wrote a letter to Correa stating that he would not testify against him and urging him not to worry because neither one of them had shot Cappelli. Correa also had a criminal history,

and completely denied being present when the murder took place, despite testimony by Menough and Sobnosky that there was a second man involved who generally fit Correa's description. Additionally, there are some inconsistencies. Correa and Dawson both testified that the club closed around 2:00 or 2:30 a.m., but the murder occurred just after 4:00 a.m. There are also questions as to how much alcohol Menough and Sobnosky consumed that night and their precise descriptions of the suspects.

{¶ 63} Based upon the totality of the evidence, these inconsistencies do not render the verdict against the manifest weight. The jury did not lose its way in convicting Correa of the charges. Rather, they reasonably weighed the evidence and resolved the credibility issues against him. Accordingly, Correa's second and third assignments of error are meritless.

*Correa*, 2015 WL 5691899, at **9-11.

Here, the Ohio Court of Appeals applied the same, correct, sufficiency standard as articulated in *Jackson v. Virginia*. Its conclusion was not unreasonable, and Correa does not allege otherwise. Although he complains that there is no physical, forensic, photographic or video evidence connecting him to the crime (Doc. 4, p. 14), circumstantial evidence alone is sufficient to support a conviction. *See Johnson*, 200 F.3d at 992. Although he complains that Sobnosky's and Menough's testimony was inconsistent with each other and with Dawson and that Dawson only testified after cutting a deal with the state (Doc. 4, pp. 10-12, 14), the Ohio Court of Appeals considered the fact that the witness testimony was inconsistent and observed that Dawson cut a deal with the state. Moreover, these facts were all considered by the jury at trial. Ultimately, the jury believed Dawson, Sobnosky and Menough over Correa and, accordingly, there was sufficient evidence to prove the elements of the crimes charged. In sum, the Ohio Court of Appeals' determination that, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, was not unreasonable. *Jackson*, 443 U.S. at 319. Ground 3 fails on the merits.

### D. Ground 4 fails on the merits

In Ground 4, Correa argues that the trial court erred when it gave a jury instruction for complicity as an aider and abettor when the evidence at trial was contrary to the instruction and the state's theory of the case.  Doc. 4, p. 15.  Correa asserts that there was no evidence presented at trial that anyone other than Correa was the shooter; therefore, an instruction on aiding and abetting was contrary to the evidence and the state's theory of the case.  Id.  To the extent Correa argues that the jury instruction was contrary to Ohio's standard jury instructions, such a claim is not cognizable on federal habeas review.  *Estelle*, 502 U.S. at 71-72.

The Ohio Court of Appeals considered this claim:

{¶ 64} Correa's fourth of five assignments of error asserts:

> The trial court erred to the prejudice of the Appellant by giving an instruction to the jury for complicity as an aider and abettor when the evidence and testimony adduced at trial was contrary to the instruction and in contradiction to the Appellee's theory of the case.

{¶ 65} Regarding jury instructions generally, a defendant is entitled to have the trial court give complete and accurate jury instructions on all the issues raised by the evidence. *State v. Sneed*, 63 Ohio St.3d 3, 9, 584 N.E.2d 1160 (1992). Applying an abuse of discretion standard of review, *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989), an appellate court must review the jury instructions as a whole in determining whether the trial court properly charged the jury. *State v. Burchfield*, 66 Ohio St.3d 261, 262, 611 N.E.2d 819 (1993). Regarding Correa's specific challenge to the jury instructions, "[a]lthough a defendant may be charged in an indictment as a principal, the court may instruct the jury on complicity where the evidence at trial reasonably supports a finding that the defendant was an aider or abettor." *State v. Ratkovich*, 7th Dist. No. 02 JE 16, 2003–Ohio–7286, ¶ 10, citing *State v. Gonzales*, 151 Ohio App.3d 160, 178–179, 783 N.E.2d 903 (1st Dist.2002).

{¶ 66} Regarding the offenses of tampering with evidence and arson, Dawson testified that after Correa shot Cappelli, Correa drove Cappelli's car back to Terrence's house on Hunter Ave. Concerned about having Cappelli's vehicle in their possession, Dawson and Correa decided to drive the vehicle back to where Cappelli was killed and set it on fire. Dawson did not remember who started the fire.

{¶ 67} Based on this testimony, the trial court did not err by instructing the jury on complicity. The State presented evidence at trial that reasonably supported a finding that Correa and Dawson were complicit in committing the crimes of tampering with evidence and arson. Accordingly, Correa's fourth assignment of error is meritless.

*Correa*, 2015 WL 5691899, at *11-12.

The Ohio Court of Appeals' decision was not unreasonable.  Moreover, Sobnosky testified at trial that she heard a car drive down her street, she heard six shots, including the last shot as she saw the car drive past her house, and the car, still moving, turned around and left. Doc. 10-2, pp. 178-181.  She testified that the car came back seven minutes later, stopped at the curb, and dumped a body.  Doc. 10-2, pp. 194-195.  In other words, contrary to Correa's assertion, there was evidence presented at trial that told a slightly different story than Dawson's testimony and, if believed, a jury could find that Correa, if not the shooter, was complicit with Dawson in the crimes aggravated murder and aggravated robbery.

Ground 4 fails on the merits.

### E. Ground 5 is not cognizable and/or fails on the merits

In Ground 5, Correa argues that the trial court erred when it did not follow Ohio state sentencing statutes when sentencing him.  Doc. 4, p. 19.  This describes a violation of state sentencing laws and, as such, is not cognizable on federal habeas review.  *See Austin v. Jackson*, 213 F.3d 298, 300 (6th Cir. 2000) (citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984)).

To the extent Correa's claim could be construed as alleging a constitutional violation, it fails.  The Ohio Court of Appeals considered this claim:

{¶ 68} In his fifth and final assignment of error, Correa asserts:

The trial court erred to the prejudice of Appellant by sentencing him to the maximum consecutive sentences for his convictions for aggravated murder and aggravated robbery with firearm specifications and for tampering with evidence and arson without properly considering Ohio sentencing statutes pursuant to R.C. 2953.08(G)(C)(4).

{¶ 69} As initial matter, Correa was not sentenced to maximum sentences on all counts as he contends. The maximum sentence for aggravated murder with no aggravating circumstances specified in the indictment is life without parole. Correa received a 25–years–to–life sentence. *See* R.C. 2903.01; R.C. 2929.03. Further, the maximum sentence

for arson is 18 months, and Correa was sentenced to one year. *See* R.C. 2909.03(A)(1) and (B)(2)(b) and 2929.14(A)(4).

{¶ 70} R.C. 2929.14(C)(4) directs the trial court to make certain findings prior to imposing consecutive sentences:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 71} Recently, in *State v. Bonnell*, 140 Ohio St.3d 209, 2014–Ohio–3177, 16 N.E.3d 659, the Supreme Court of Ohio clarified that:

> When imposing consecutive sentences, a trial court must state the required findings as part of the sentencing hearing[.] * * * [T]he court should also incorporate its statutory findings into the sentencing entry. However, a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld.

(Internal citations omitted.) *Id*. at ¶ 29.

{¶ 72} At the sentencing hearing, the trial court made the following findings:

> I am going to find in order to protect the public and punish you—and additionally find that the sentences are not disproportionate, and that the harm was so great or unusual that a single term does not adequately reflect the seriousness of your conduct—that consecutive sentences are necessary.

{¶ 73} The sentencing entry states:

> This Court finds pursuant to R.C. 2929.14(C)(4) that consecutive sentences are necessary to protect the public from future crime or to punish the offender and (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct, and the sentences in Counts Two, Three and Four shall be served consecutively to each other and consecutively to Count One, for a total sentence of FORTY–THREE (43) YEARS to life.

{¶ 74} This is sufficient to comply with R.C. 2929.14(C)(4). Although the trial court's findings were much briefer during the hearing, they are sufficient to support consecutive sentences under subsection (b). Moreover, the trial court elaborated more in its sentencing entry.

{¶ 75} Correa argues that the trial court herein "did little more than simply cut and paste the requisite verbatim language set forth in R.C. 2929.14(C)(4)," and failed to provide any specific reasons. However, a trial court need not give reasons in support of its findings under R.C. 2929.14(C)(4). *State v. Hanlin*, 7th Dist. No. 13 JE 36B, 2014–Ohio–5719, ¶ 25; *State v. Power*, 7th Dist. No. 12 CO 14, 2013–Ohio–4254, ¶ 38.

{¶ 76} Pursuant to *Bonnell*, this court must also determine whether the record contains evidence in support of the trial court's findings. *See Bonnell*, *supra*, at ¶ 29. Relevant here, the statute requires that: "the harm caused by two or more of the multiple offenses so committed [be] so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct[.]" R.C. 2929.14(C)(4)(b).

{¶ 77} Correa killed a man and attempted to cover up the crime by stealing the victim's vehicle, returning it to the scene of the crime and then setting fire to it. The record demonstrates that the trial court properly imposed consecutive sentences in this case pursuant to R.C. 2929.14(C)(4). Accordingly, Correa's fifth assignment of error is meritless.

*Correa*, 2015 WL 5691899, at *12-13.

It cannot be said that the Ohio Court of Appeals' determination that the trial court did not err in sentencing Correa to consecutive sentences was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-

minded disagreement." *Harrington*, 562 U.S. at 103.  Therefore, to the extent Ground 5 alleges a federal constitutional violation, it fails on the merits.

### IV. Conclusion and Recommendation

For the reasons stated above, the undersigned recommends that Correa's habeas Petition be **DENIED** because Grounds 1 and 5 are not cognizable and/or fail on the merits, Ground 2 is not cognizable, and Grounds 3 and 4 fail on the merits.

Dated: October 25, 2017

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).